## Electric Plant Board of City of Mayfield et al. v. City of Mayfield et al.

Jan. 30, 1945.

376

R. A. Roberts for appellants.

Aubrey Hester for appellees.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Affirming in part, reversing in part.

In the year 1942, under ordinances duly adopted by the Board of Council, the City of Mayfield acquired the waterworks plant previously owned by the Kentucky-Tennessee Light & Power Company. Funds for its purchase were obtained from the sale of Water Works Revenue Bonds. The ordinances authorizing the purchase and providing for the operation and control of the system, as well as the bonds issued in pursuance of the ordinances, provided for the payment to the city by the Electric Board (created to operate jointly the water

and electric systems) certain sums of money yearly, as "tax equivalents." The ordinances above referred to likewise provided that the City Council could transfer any surplus (after the payment of the costs of maintenance and operation and the satisfaction of sinking fund requirements) to the general fund of the city. The city commenced the operation of the plant January 1, 1943. Previous to the acquisition of the system by the city, the latter paid the Kentucky-Tennessee Light & Power Company a yearly hydrant rental of $40 each for the first 100 hydrants, and $30 each for the remaining 81 hydrants used by the city for fire protection. The city paid rentals to the Electric Board at this rate until June 1944. In June, 1944, the Board and City Council agreed upon a straight rate of $24 per year per hydrant, which rate it is conceded is reasonable. The City Council passed an ordinance modifying the rate in accordance with the agreement, but declared the rate to be retroactive to January 1, 1943.

On the 16th day of August, 1944, this action was instituted by the Board; its individual members; and a citizen, taxpayer, and consumer of water of the City of Mayfield; against the City of Mayfield, its Mayor, and Board of Council; wherein plaintiff sought a declaration of the rights of the parties under the Statutes of the Commonwealth and the ordinances of the city hereinbefore referred to. The questions presented are:

1. Did the Board of Council have the authority to direct the surplus revenues of the Water Works to be transferred to the general fund of the city?

2. Can the city and Board legally follow the direction of the ordinance adopted by the Board of Council to make the reduction in fire hydrant rates retroactive?

3. Can the City Council require the Board to pay to it any sum of money as an equivalent for taxes?

It is contended by the Board: (1) That, in the event the revenues of the Board exceed the costs of operation, maintenance, and sinking fund requirements, it is the duty of the Board to reduce consumers' rates to the extent that the revenues produced will not exceed such requirements, and that the city is not entitled to profit by the operation of the plant; (2) that neither the Board nor the city has, nor do they jointly have, the legal right to give retroactive effect to the reduction in rates to

be paid by the city for fire hydrants; and (3) that the city does not have the authority to require the Board to pay tax equivalents to the city. The city contends conversely in each particular.

Our conclusion in respect to the first question is of controlling influence in a determination of the second and third. Because the headnotes in the Revised Statutes do not indicate, in each instance, to which class of city the various sections apply, one must look to the original enactments to determine the sections the General Assembly intended to apply to cities of the various classes. The City of Mayfield is a fourth-class city, and acquired its water plant under the authority of KRS 96.350 to 96.510, inclusive. KRS 96.430 provides that out of the revenues received by the waterworks, the city council, by ordinance, first shall set aside a separate fund sufficient in amount to pay the interest on and retire the principal of the bonds issued for the purchase of the plant as and when they shall become due. After this requirement shall have been met, the board shall set aside a sufficient amount of the revenue received to establish a proper and adequate depreciation account. Next, the board shall set aside a sufficient amount of the revenue received to reasonably and properly operate and maintain the waterworks. There is a further provision contained in KRS 96.440, that any surplus accumulating in the operating and maintenance fund over and above the requirements of the then current year and the succeeding year may be transferred by the city council to the depreciation account, to be used for "improvements, extensions or additions to the waterworks." In other words, before a surplus in the operating and maintenance funds may be transferred to the depreciation account, it must be in excess of the current year's, and the ensuing year's, operating and maintenance requirements. This provision is mandatory only when conditions require the direction to be followed in the exercise of reasonable judgment; that is to say: When improvements, extensions, or additions reasonably should be anticipated. Nothing contained in the Act compiled in KRS 96.350 to 96.510, inclusive, which is an Act of the General Assembly of 1926, as amended in 1932 and 1936, suggests the disposition to be made of any surplus or net earnings over and above the requirements hereinbefore set out. Directions in this respect, however, are contained in KRS 96.200, which reads: "The legislative

body of any city of the fourth class may, by ordinance, provide in what manner and for what purpose any profits, earnings or surplus funds arising from the operation of any public utility owned or operated by the city may be used and expended. The ordinance may be amended or repealed from time to time. Until such an ordinance is enacted any surplus earnings shall be paid into the city treasury, to be expended for the general purposes of government in the city.''

Thus it will be seen that the Legislature intended that a city of the fourth class operating a waterworks plant should use the profits, if any, derived from its operation, to supplement the general fund of the city; and should not hold such profits in trust for the users of water, unless, of course, they should exceed a fair return upon the property used and usable. This intention is so plainly manifested, that further comment would be superfluous. We therefore conclude, in answer to the first question propounded, that the City of Mayfield has the authority to, as it did by ordinance, direct that the surplus, over and above the operating and maintenance costs and statutory sinking fund requirements, be paid into the general fund of the city.

That being true, it had the right to retroactively reduce the fire hydrant rate paid by it to the Board, provided such reduction did not, and will not, deplete or embarrass the operating, maintenance, or sinking funds. It is conceded that there is a sufficient surplus from profits, after all statutory requirements have been met, to refund to the city the amount it has paid to the Board in excess of $24 per year per hydrant from the time of the commencement of operation of the plant by the Board. This amount would be payable to the general fund of the city, as net profits, had the fire hydrant rate not been reduced; and we see no substantial difference between its refund by reason of a retroactive reduction in rates and direct payment authorized by KRS 96.200. Therefore, we conclude that neither the Board nor the consumers of water can complain of the retroactive effect of the ordinance reducing fire hydrant rates.

It is obvious, from reading the Statutes hereinbefore referred to, that the city has no right to withdraw any sum of money from the revenues of the water plant until first funds sufficient in amount to cover operating, maintenance, and sinking fund requirements shall have

been set aside. That being true, the city's right to exact tax equivalents from the surplus funds likewise could not be questioned, were it not for the fact that such with-drawal would constitute an operating expense of the plant, and thus deplete the profit and loss account which eventually must control the Board's action in increasing, decreasing, or maintaining the present consumers' rates. In the operation of its waterworks, the city is acting in its proprietary capacity. Previous to its acquisition of the plant, it received in its governmental capacity from the Kentucky-Tennessee Light & Power Company taxes in the approximate amount of the tax equivalent it will receive under the ordinance in question. In determining what is to be a fair and reasonable profit on the property used and usable, the city should be permitted to be compensated for the loss of taxes resulting from its ac-quisition of the plant, before it can be required to cal-culate its profits in anticipation of a reduction in rates. Even the TVA Act (KRS 96.550 to 96.900, inclusive), which was passed for the exclusive benefit of consumers, recognizes the soundness of the theory that the city is entitled to be compensated for the loss in taxation re-sulting from its acquisition of the utility therein au-thorized. KRS 96.820. If the city is entitled to collect tax equivalents from a plant acquired by it for the ex-clusive benefit of consumers, we see no reasonable ground for concluding that it is not entitled to exact tax equivalents from a plant acquired for its own benefit, without being required to account therefor in deter-mining what is a fair return on the property, as such ultimately will affect rates to be paid by consumers. It is no more than a fair adjustment between the taxing body of the city and the consumers ultimately to be benefited by the city's acquisition of the plant. KRS 96.270, cited by appellants, providing for the city's free use of water for its fire department, police departments, public build-ings, public highways, parks and schools and exempting the property of the water board from taxation for city purposes, has no application to the questions involved, because that section of the Statutes applies exclusively to cities of the first class; as readily will be seen by referring to its corresponding section in Carroll's Ken-tucky Statutes, viz., Section 3024a-6, and Chapter 16, page 52, Section 6 of the Acts of the General Assembly of 1906. We therefore conclude the City Council has the legal right to require the Electric Board to pay to it

reasonable tax equivalents and charge such amounts as operating expenses in the computation of its net earnings.

The judgment on the original appeal is affirmed; the judgment on the cross-appeal is reversed, with directions that another be entered in conformity with this opinion.

Whole Court sitting.